Jill M. Young
jillyodasilver@gmail.com
General Delivery
Grants Pass OR 97526
541-513-1153
Plaintiff Pro Se

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

JILL M. YOUNG,

          Plaintiff

    v.

CITY OF GRANTS PASS;
STEPHANIE NUTTALL;
AARON CUBIC; WARREN
HENSMAN; BRIAN CONEY;
and CHRISTY LANSDOWN,

          Defendants

Case No: 1:26-cv-01431-MC

COMPLAINT FOR CIVIL RIGHTS
VIOLATIONS, STATUTORY VIOLATIONS,
AND COMMON LAW TORTS

DEMAND FOR JURY TRIAL

Page 1 – Complaint

## I. INTRODUCTION

1.1  Plaintiff is a disabled resident of Grants Pass, living in an unstable housing situation with no reliable source of income. Plaintiff currently lives on property owned by family members and in a structure provided by a different family member. Because Plaintiff has little-to-no income or savings, all it would take for her to become homeless would be an argument or decision by the property owners.

1.2  Plaintiff has tried to manage her Post-Traumatic Stress Disorder, Major Depressive Disorder, and Panic Disorder with Agoraphobia so she can return to work. This included starting therapy around the beginning of April, 2025. Before her interactions with the City of Grants Pass and the Grants Pass Police Department (GPPD), she was taking 30mg paroxetine (generic Paxil) daily and 0.5mg alprazolam (generic Xanax) as needed.

1.3  Around August 2025, Plaintiff was feeling like she was about ready to go back to work.

1.4  In September, 2025, Plaintiff witnessed a situation involving two people she knew, and struggled with whether to report one of them. On October 6 or 7, 2025, Plaintiff made the decision to report the person. She was able to finally get a good night's sleep and was at peace with her decision to go to the GPPD.

1.5  On October 9, 2025, Plaintiff attempted to report the person and marijuana crimes to the GPPD. The GPPD redirected her to the Josephine County Sheriff's Office (JCSO) despite the crimes occurring within city limits. Plaintiff trusted the GPPD and went to the JCSO, even though she was confused as to why city crimes would be reported to the JCSO.

1.6  After reading the JCSO website regarding crime reporting and not hearing from the JCSO, Plaintiff started losing trust in the GPPD but did return to them on October 14, 2025. She was reluctant to share information with the records clerk, though, because she was concerned she would end up in a jurisdictional limbo.

1.7  After a report was taken, Plaintiff tried to continue her cooperation with the GPPD, asking for another digital link to upload additional files to the evidence locker. The silence by GPPD regarding her requests for another evidence upload link, along with the previous redirection, led to her experiencing acute periods of derealization where Plaintiff's attempts

to fulfill her civic duty felt surreal and fake.

1.8 It was during this time (October 21, 2025) that Plaintiff visited a physician and had the dosage of paroxetine increased from 30mg to 40mg.

1.9 On November 4, 2025, when the records clerk told Plaintiff she had been uncooperative on October 14, among other things, it triggered a stretch of time where Plaintiff took multiple tablets of alprazolam for anxiety and struggled to process what the clerk had said.

1.10 Plaintiff lost all trust in the GPPD and other law enforcement agencies. Because of this, Plaintiff stayed inside as much as possible on November 4 and 5, went to her therapy on November 5, then bolted for Corvallis, a place she perceived as safe compared to the Rogue Valley.

1.11 This displacement resulted in Plaintiff spending three nights in Corvallis, including one in a hotel and two in a vehicle.

1.12 While in Corvallis, Plaintiff experienced an acute derealization episode. This led her to decide that the best way to cope with what happened with the GPPD was to tell herself there was a miscommunication on everyone's part.

1.13 After Plaintiff experienced some stabilization, her coping mechanism turned to creating a timeline of events and using public records requests to find out if the uncooperative label was in police records.

1.14 On December 17, 2025, Plaintiff looked up the statute cited in her police report and found it had been repealed in 2017. Seeing that statute, from a chapter that does not relate to marijuana, reinforced Plaintiff's lack of trust in the GPPD and their ability to produce accurate reports.

1.15 Plaintiff continued stabilizing on the higher dose of paroxetine through December, 2025.

1.16 On January 16, 2026, Plaintiff gave a heads-up to the City Attorney, Stephanie Nuttall, and Chief of Police, Warren Hensman, that she would be sending a complaint letter and filing a tort claim notice the next week. Plaintiff wished to be transparent because she felt the Chief was an approachable person who didn't deserve to be blindsided by a complaint letter and a tort claim notice.

1.17 Even when the Chief began saying "it's nice to meet you" and nothing else, Plaintiff understood as soon as the City Attorney explained why. To this day, Plaintiff does not feel animosity towards the Chief, just frustration with the GPPD as a whole.

1.18 After Plaintiff filed the Notice of Tort Claim on January 20, 2026, the timeline she had constructed and planned on continuing to update no longer acted as a coping mechanism.

1.19 Between the loss of the coping mechanism and the continued failure of the GPPD Records Unit to meet the statutory acknowledgement and deadline for public records requests, Plaintiff knew she needed to be more proactive regarding her mental well-being.

1.20 Plaintiff requested ADA reasonable accommodations on February 1, 2026, to mitigate PTSD and depression.

1.21 Later that afternoon, Plaintiff received public records where Mobile Data Terminal (MDT) messages showed a records clerk messaging a sergeant, saying Plaintiff was a "fun one" and "not being very cooperative" (quoted material capitalized in original). Plaintiff was emotionally drained for over five hours after skimming those messages. It was not until late the next day that Plaintiff was able to analyze the MDT messages.

1.22 Through February and March, the GPPD Records Unit continued missing public records request deadlines and statutory acknowledgments, reinforcing Plaintiff's need for a predictable environment.

1.23 Without the environment Plaintiff sought, her mental health declined in February and into March, with depression triggering periods of 24-hour fasting and one 24-hour period of consuming only four ounces of water because it was "too much work" to go to the kitchen for food or water.

1.24 On March 10, during an appointment with Plaintiff's primary care provider, an additional daily medication was prescribed.

1.25 In early April, Plaintiff turned to researching and writing a lawsuit against the City as a coping mechanism.

1.26 Despite this new coping mechanism, Plaintiff was still struggling to reach stability.

1.27 To this day, Plaintiff's loss of trust in the GPPD from November remains unchanged.

Plaintiff recently became aware of an alleged drug sale within city limits. Unlike the situation in September where she struggled over whether to report it, Plaintiff does not even have to make a decision this time. She is not considering reporting it at all, simply because she does not trust the GPPD to take an accurate report or to refrain from acting unprofessionally behind her back. While Plaintiff would still contact emergency services through 9-1-1 for a visibly life-threatening incident or to secure medical help for an injured person, she is completely deterred from engaging with the GPPD for standard crime reporting due to this breakdown in institutional trust.

## II. JURISDICTION

2.1  This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States.

2.2  This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of Plaintiff's First and Fourteenth Amendment rights, and under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.

2.3  This Court has supplemental jurisdiction over any related state law claims pursuant to 28 U.S.C. § 1367.

## III. VENUE

3.1  Venue is proper in the United States District Court for the District of Oregon pursuant to 28 U.S.C. § 1391(b).

3.2  The events, acts, and omissions giving rise to the claims asserted herein occurred within the City of Grants Pass, Josephine County, which is located within this judicial district and the Medford Division.

3.3  All defendants reside or are located within this judicial district.

## IV. PARTIES

*Plaintiff*

4.1  Jill Young is a disabled resident of Grants Pass, Josephine County, Oregon. She has preexisting PTSD, Major Depressive Disorder, and Panic Disorder with Agoraphobia.

*Defendants*

Page 5 – Complaint

4.2 City of Grants Pass (the City) is a municipal corporation and local government entity located in Josephine County, Oregon, with its principal place of business at 101 NW A St, Grants Pass OR 97526. It is a public entity within the meaning of the Americans with Disabilities Act (ADA).

4.3 Stephanie Nuttall (the City Attorney or Nuttall), at all times relevant to this action, was employed as the city attorney by the City of Grants Pass at 101 NW A St, Suite 205, Grants Pass OR 97526. Nuttall began performing human resources duties in addition to legal duties after the HR Director left in 2025. When Nuttall applied for the position of Grants Pass city attorney, she had bar memberships with the Oregon State Bar, Minnesota State Bar, US District Court - District of Oregon Bar, and the US Supreme Court Bar. She is sued in her individual capacity.

4.4 Aaron Cubic (the City Manager or Cubic), at all times relevant to this action, was employed as the city manager by the City of Grants Pass at 101 NW A St, Suite 205, Grants Pass OR 97526. Pursuant to the Grants Pass City Charter, Chapter V, Section 2, Cubic is the administrative head of the City government with general supervision over all City of Grants Pass departments and the enforcement of all ordinances. In this capacity, Cubic serves as the final policymaker for the City of Grants Pass regarding the administration of municipal services and the implementation of ADA compliance protocols. He is sued in his individual capacity.

4.5 Warren Hensman (the Chief or Chief Hensman), at all times relevant to this action, was employed as the chief of police by the City of Grants Pass at 726 NE 7th St, Grants Pass OR 97526. He is sued in his individual capacity.

4.6 Brian Coney (Sgt Coney or Coney), at all times relevant to this action, was employed as a sergeant with the GPPD at 726 NE 7th St, Grants Pass OR 97526. Including his time as a reserve officer, he has over twenty years of law enforcement experience in Southern Oregon. He is sued in his individual capacity.

4.7 Christy Lansdown (Lansdown), at all times relevant to this action, was employed as a records clerk with the GPPD at 726 NE 7th St, Grants Pass OR 97526. She is sued in her

individual capacity.

*Nonparty Actors*

4.8 Andrew Aguinaga (Cpl Aguinaga), at all times relevant to this action, was employed by the GPPD as a corporal. Including his time as a reserve officer, he has more than twenty years of law enforcement experience in Southern Oregon. He is a nonparty actor and is not sued in this action.

4.9 George Gasperson (Gasperson), at all times relevant to this action, was employed by the GPPD as a detective with the Rogue Area Drug Enforcement (RADE) team. He is a nonparty actor and is not sued in this action.

4.10 Logan Martin (Martin), at all times relevant to this action, was employed by the GPPD as a detective with RADE. He is a nonparty actor and is not sued in this action.

4.11 Grace Satterfield (Satterfield), at all times relevant to this action, was employed as a records clerk with GPPD. She is a nonparty actor and is not sued in this action.

4.12 Sarah Stewart (Stewart), at all times relevant to this action, was employed as a records clerk with the GPPD. She is a nonparty actor and is not sued in this action.

4.13 Jesse Wallace (Sgt Wallace), at all times relevant to this action, was employed as a sergeant with the GPPD. He has more than twenty years of law enforcement experience in Southern Oregon. He is a nonparty actor and is not sued in this action.

## V. STATEMENT OF FACTS

*Redirection to the Josephine County Sheriff's Office and Relevant Information*

5.1 On October 9, 2025, at approximately 8:10 a.m., Plaintiff arrived at the GPPD to report suspected drug felonies and interstate drug trafficking.

5.2 Plaintiff requested to speak with a detective due to the nature of the crimes. Stewart offered to have a patrol officer speak with Plaintiff, but after consulting with a drug detective (Gasperson), Stewart informed Plaintiff that because the matter involved "strictly marijuana," Plaintiff needed to file a report with the JCSO.

5.3 Relying on the GPPD's instructions, Plaintiff traveled immediately to the JCSO at approximately 8:45 a.m. the same day.

5.4    Upon arrival at the JCSO, a clerk instructed Plaintiff to leave a voicemail for a specific extension. At 8:56 a.m., Plaintiff placed a phone call from the JCSO parking lot and left a message.

5.5    On October 13, 2025, Plaintiff sought to verify the jurisdictional policy being cited by the GPPD. Plaintiff reviewed the official JCSO website which stated that crimes occurring within city limits are the jurisdiction of the respective city police department.

5.6    On January 3, 2026, Plaintiff submitted a public records request to the GPPD. Plaintiff requested "all formal and informal policies and procedures for sworn and non-sworn personnel of the Grants Pass Police Department when a citizen calls or goes to the police lobby to report illegal marijuana activity occurring within Grants Pass city limits."

5.7    On January 13, 2026, Satterfield wrote in response to the request, "We do not have a policy on redirecting citizens to other agencies."

5.8    On January 30, 2026, Plaintiff emailed Sgt Wallace to clarify the jurisdictional issue.

5.9    On February 6, 2026, Plaintiff emailed Sgt Wallace a second time as he had not responded to the earlier email. Plaintiff wrote, "I'll take your silence to mean that GPPD does have jurisdiction and any rerouting to the sheriff's office without first taking a report is intentional avoidance of duty."

5.10    Sgt Wallace did not provide a response to Plaintiff's communication.

5.11    Furthermore, in communications on February 2 and 3, 2026, the Josephine County Sheriff, Dave Daniel, confirmed via email there is no formal policy allowing the GPPD to divert marijuana cases within city limits to the Sheriff's Office without first taking a report. See Exhibit A.

5.12    In May, 2026, the GPPD Records Unit was continuing to tell citizens that marijuana activity should be reported to the Josephine Marijuana Enforcement Team (JMET) at JCSO.

*Police Report, Repealed Statute, and Relevant Information*

5.13    On October 14, 2025, at approximately 2:10 p.m., Plaintiff arrived at the GPPD and requested to speak with a supervisor regarding the redirection to the JCSO and to take a

Page 8 – Complaint

report.

5.14 Plaintiff was reluctant to share information with the records clerk (Lansdown) as she did not want to be redirected to the JCSO again.

5.15 Lansdown informed Plaintiff a supervisor was on their way and a detective was on it for the drugs.

5.16 At 2:13:06 p.m., Lansdown entered into the Computer-Aided Dispatch (CAD) notes, "COMPL DID NOT GO TO SHERIFF AS STATES INCIDENT IS OCCURRING AT THE I/L AND IS ACTIVE AND ONGOING" (capitalization in original).

5.17 Lansdown and Sgt Coney were exchanging MDT messages between 2:15 p.m. and 2:26 p.m.

   A. At 2:15 p.m., Lansdown called Plaintiff a "FUN ONE" (capitalization in original).

   B. At 2:18 p.m., Lansdown wrote Plaintiff was "NOT BEING VERY COOPERATIVE" (capitalization in original).

5.18 Despite the Records Unit's "strong focus on customer service," Lansdown, at no point during the time Plaintiff was in the GPPD lobby—from approximately 2:10 p.m. until 3:50 p.m.—asked Plaintiff if she had gone to the sheriff's office.

5.19 At approximately 3:25 p.m., Plaintiff spoke with Cpl Aguinaga about the redirection to the JCSO and the suspected drug felonies and interstate drug trafficking.

5.20 The report was reviewed and approved by Coney on October 23, 2025.

5.21 The report included a citation of Oregon Revised Statutes (ORS) 475.856 for the offense.

5.22 Per the 2025 ORS, "**475.856** [2005 c.708 §29; 2013 c.591 §1; 2015 c.1 §77; 2015 c.614 §121; 2016 c.24 §42; repealed by 2017 c.21 §126]" (bold in original).

5.23 This was the first GPPD police report since before January 1, 2020, to cite ORS 475.856.

5.24 This is despite the Chief saying, at a city council meeting on March 4, 2026, they (the GPPD) were "pretty savvy to the Oregon Revised Statutes."

5.25 At 9:46 a.m. on November 4, 2025, Plaintiff received a phone call from Martin.

5.26 Martin said he had handed the case off to detective Aric Compton of JMET at the JCSO.

5.27 The call with Martin was the first time Plaintiff had heard "JMET" from any employee,

sworn or non-sworn, at the GPPD.

5.28 At 9:52 a.m., Plaintiff called the non-emergency line, which is recorded by the department, and asked why the case had gone to RADE if it was supposed to go to JMET. Lansdown responded to Plaintiff that on October 14:

    A. "You were uncooperative."

    B. "You refused to go to the sheriff's office."

    C. You "gave little evidence."

    D. You should have gone to JMET because it was "strictly marijuana."

    E. GPPD took a "courtesy report."

5.29 Plaintiff responded with "strictly marijuana" had no meaning to her, no one told her JMET until November 4, and a list of information she had uploaded to the digital evidence locker.

5.30 On February 4, 2026, in response to a public records request regarding all available codes for marijuana-related offenses used in the department's records management system, Plaintiff received an email from Satterfield. Satterfield stated, "The Master Offense table you are requesting, that we utilize would be the Oregon Revised Statutes as a whole," and gave a link to the 2026 ORS.

5.31 Plaintiff replied to Satterfield, stating she would take that to mean that using ORS 475.856 on an October 2025 report was a "deliberate choice by the reporting officer that was allowed to remain by the supervisor who reviewed and approved the report."

5.32 Plaintiff did not receive a response in regards to that statement.

5.33 On January 23, 2026, Plaintiff submitted a public records request to the GPPD, requesting "any written or electronic reference materials (such as but not limited to SOPs or justFOIA materials) sergeants have access to use when reviewing and finalizing officer narratives. I am looking for anything that is available to assist them during the process. I was already informed that "internal report review checklists and supervisor quality control manuals used by sergeants when reviewing and finalizing officer narratives " do not exist. If absolutely no reference material is available, when did Sgt Coney last receive training on reviewing and finalizing officer narratives. Please provide the training materials. If the

GPPD is not the custodian of such training materials, please indicate who is."

5.34 Satterfield responded on February 25, 2026, with "Supervisors do not attend or receive special training in reference to reviewing and finalizing officer narratives. Grants Pass Police Department has no records responsive to your Public Records Request."

5.35 On March 8, 2026, Plaintiff emailed the City Attorney, City Manager, and the GPPD Records Unit Supervisor, Elysia Torres, stating she expected the cited statute, ORS 475.856, to be replaced with the correct, current statute by the end of March 13. The only communication Plaintiff received was an automated email message from Torres saying Torres was out of the office until Thursday.

5.36 On March 14, 2026, when Plaintiff called the GPPD Records Unit to check on the statute, Stewart said that ORS 475.856 was still cited.

5.37 The department's failure to correct the legal error occurred in spite of the Chief's March 19, 2025, statement to the City Council regarding accountability: "And if we go wrong, we're big enough people to, to take that also, and move past that, move through it."

5.38 Prior to Plaintiff's experience with the GPPD, the GPPD had performed an internal investigation into use of force by a corporal against a juvenile. The incident in question occurred on October 31, 2024 and resulted in the corporal being demoted. An arbitrator was appointed to review the grievance issued by the Grants Pass Police Association on behalf of the grievant. See Exhibit B(1)

5.39 The Arbitrator determined that the "record establishes, by a preponderance of the evidence, that *both* the investigation, and the Final Report were *seriously flawed* and did not provide basic due process rights to Officer [name redacted in original]" (emphasis and capitalization in the original). See Exhibit B(2).

5.40 The Arbitration Decision also noted that the Notice of Investigation given to Officer [name redacted in original], included ORS 161.233, "a *criminal* statute plainly *irrelevant* to determining whether Officer [name redacted in original] violated the department's internal Use of Force Policy" (emphasis and capitalization in original). See Exhibit B(3).

5.41 Captain DeKruger was the officer tasked with reviewing the internal investigation final

report, yet the Arbitrator noted "by the time he viewed it, the Final Report had been finalized and distributed" and "Effective oversight requires more than a cursory review for typographical errors; it requires ensuring that the investigation is complete, accurate, and grounded in the correct analytical framework. Captain DeKruger's testimony reflects none of those hallmarks" (citation omitted, capitalization in original). See Exhibit B(4).

5.42 The Arbitrator concluded, "Simply put, given the unreliability of the investigation and Final Report, the undersigned concludes that the Employer failed to establish that it conducted a fair and through [sic] investigation" (capitalization in original). See Exhibit B(5).

5.43 In contrast, the Chief stated, during the January 7, 2026, city council meeting, "I just want to make it known that the Grants Pass Police Department treat every single person with dignity and respect. It doesn't matter what your situation is. And we have a track record of that. Our community response team and our police officers that are boots on the ground every single day treat everybody the exact same way."

*Notice of Tort Claim*

5.44 Plaintiff hand-delivered on January 20, 2026, a signed Notice of Tort Claim to the City of Grants Pass Administration Office.

5.45 In addition, unsigned copies of the Notice of Tort Claim were emailed to the City Attorney and City Manager the same day.

5.46 The Notice of Tort Claim alerted the City Attorney and City Manager to the GPPD Records Unit's statutory noncompliance with public records law and Plaintiff's medication increase, pre-existing PTSD, and periods of derealization.

*ADA Reasonable Accommodation Request and Relevant Information*

5.47 A search of the City's website did not result in the discovery of an ADA coordinator or a form or method of requesting ADA accommodations.

5.48 On February 1, 2026, Plaintiff emailed the City Attorney and City Manager her ADA reasonable accommodation request. See Exhibit C.

5.49 On March 4, 2026, Plaintiff emailed the City Attorney and City Manager for a status

update on her ADA request.

5.50 Even allowing for a month to implement Plaintiff's ADA requests, the GPPD Records Unit, after March 4, 2026, used inconsistent font style and/or size, were not following ORS 192, and did not remove the three records clerks Plaintiff asked be removed.

5.51 As of June 14, 2026, Plaintiff had not received communication from the City Attorney, City Manager, or any representative for the City regarding the requested ADA accommodations.

5.52 As of June 15, 2026, the City had not listed anyone as an ADA coordinator or published grievance procedures for alleged ADA violations.

5.53 Prior to Plaintiff's request, Disability Rights Oregon (DRO) had contacted the City from September, 2024, to January, 2025, and received no meaningful communication regarding homeless people needing ADA reasonable accommodations. *Disability Rights Oregon v. City of Grants Pass*, No. 25CV05989 (Josephine Cty. Cir. Ct. 2025) First Am. Compl. ¶¶ 123-126.

5.54 DRO noted in their complaint that the City had no process by which a homeless person could request an accommodation. *Id.* ¶ 128.

5.55 DRO also noted it was said by the contract city attorney "that any reasonable accommodations extended to homeless people in the process of law enforcement engagement are purely in the discretion of the individual officer." *Id.* ¶ 132.

5.56 The City Attorney, Nuttall, spoke at the August 6, 2025, city council meeting regarding the proposed settlement agreement with DRO. While discussing a PowerPoint-slide bullet point, she said, "To develop a reasonable ADA accommodation process which is required by law. We need to have ADA accommodations anyway."

5.57 On August 8, 2025, the City Manager signed the DRO settlement agreement.

*Public Records Requests and Relevant Information*

5.58 Plaintiff started requesting public records on November 23, 2025, through the GPPD's JustFOIA portal.

5.59 One of the ways JustFOIA markets itself is by saying it can help agencies meet deadlines.

5.60 Based on Plaintiff's public records requests and GPPD's internal JustFOIA procedures, the

software is capable of tracking deadlines and alerting records clerks.

5.61 Plaintiff became concerned when she did not receive the statutory acknowledgment required by ORS 192.324(2).

5.62 Plaintiff submitted public records requests with other municipalities and discovered that Klamath Falls and Medford use the automated email message indicating receipt of the request to meet ORS 192.324(2).

5.63 Plaintiff contacted the Public Records Advocate, Todd Albert, to verify if Klamath Falls, Medford, and Grants Pass were meeting that statutory acknowledgment with their automated emails. Plaintiff included in her email copies of the messages from each location and labeled the GPPD as Agency A.

5.64 Todd Albert responded on January 14, 2026, "Therefore, based on the information you provided, I would say that Agency A does not meet the statutory requirements for an acknowledgment." See Exhibit D.

5.65 Later that day, Plaintiff emailed the Chief and relayed Todd Albert's interpretation that Agency A (GPPD) was not meeting statutory requirements with the automated message.

5.66 On January 16, 2026, Plaintiff forwarded to the City Attorney the email sent to the Chief.

5.67 On January 20, 2026, Plaintiff emailed a complaint letter to the City Attorney and City Manager. Attached was a timeline that included Todd Albert's response.

5.68 The GPPD Records Unit JustFOIA Procedures for public records requests do include the need to contact requestors once business-day 15 has been reached but do not include giving an estimated date of completion or anything about the statutory acknowledgment detailed in ORS 192.324(2).

5.69 Public records requests submitted by Plaintiff from November 2025 through January 31, 2026, demonstrated a noncompliance rate of 42% or 53% regarding the ORS 192.324(2) statutory acknowledgment, depending on whether four canceled requests are included in the calculation.

5.70 For the same range, November 2025 through January 31, 2026, 15% or 20% did not receive any message regarding a delay by the end of the fifteenth business day (ORS

192.329(5)), depending on whether the four canceled requests are included or not.

5.71 After February 1, 2026, the date of the ADA accommodation request, Plaintiff submitted an additional fourteen public records requests to the GPPD Records Unit.

5.72 Of those fourteen requests, twelve (85%) did not receive the statutory acknowledgment required by ORS 192.324(2). Of those twelve requests, only one email was sent regarding custodianship, and that message was sent on business-day fifteen.

5.73 Of those same fourteen requests, seven (50%) exceeded the fifteen-business-day window without completion. Of those seven, only three received a notification of delay, and they were lacking the estimated completion date required by ORS 192.329(5).

5.74 The Records Unit's noncompliance rate for ORS 192.324(2) statutory acknowledgments increased from either 42% or 53% to 85% after February 1, 2026.

5.75 Similarly, the Records Unit's noncompliance rate for ORS 192.329(5), the fifteen-day delay notifications, increased from either 15% or 20% to 50% after February 1, 2026.

5.76 Regardless of minor tracking ambiguities, the GPPD Records Unit's noncompliance with ORS 192.324(2) increased by a factor greater than 1.60, and its noncompliance with ORS 192.329(5) increased by a factor of 2.5 or more.

5.77 All increases in noncompliance rates occurred while the Records Unit webpage continued to claim that on-call staff are available, when needed, "to assure quality customer service."

5.78 During this same period of time, the City's overall compliance with ORS Chapter 192 open-government laws was a subject of discussion with the City Council.

5.79 On January 16, 2026, at the city council strategic planning workshop, the City Attorney was going over public meetings law and public records in response to the public records appeal filed by the *Grants Pass Courier* to the Josephine County District Attorney, Josh Eastman.

5.80 In ruling on the matter, DA Eastman was quoted as stating, "City's reasoning may have been persuasive had it not been for the illegal meeting(s), the appearance of intentionally modifying/changing the process to subvert political oversight, and the general (as well as drastically heightened current) public interest in transparency."

5.81 Despite having reviewed public meetings law with the City Council less than three weeks prior, the City Attorney had to address the Council during the February 4, 2026, city council meeting and state, "Let's not talk in a public meeting about, um, knowingly violating public meeting law."

5.82 Councilor King's recorded response to the City Attorney's comment was, "I, uh, I don't mind doing that and somebody wants to sue me they can."

5.83 This statement directly contradicted Councilor King's previous position on February 19, 2025, when he publicly stated at a city council meeting, "And that we stop this other nonsense where we communicate by lawsuits. What a horrible way to communicate. By lawsuits."

*Notice of Tort Claim Supplement*

5.84 Plaintiff hand-delivered a signed supplement to the Notice of Tort Claim to the City of Grants Pass Administration Office on March 16, 2026.

5.85 Electronic copies of the supplement (unsigned) were emailed to the City Attorney and City Manager the same day.

5.86 The supplement alerted Nuttall and Cubic to the fact that the GPPD Records Unit was still noncompliant with public records law, that Plaintiff refused to call the Records Unit after January 21 regarding overdue public records as to not trigger flashbacks, and that Plaintiff experienced a relapse of her major depressive disorder that required an additional daily medication.

*Notice of Tort Claim Supplement Two*

5.87 On June 9, 2026, Plaintiff hand-delivered a signed second supplement to the Notice of Tort Claim to the City of Grants Pass Administration Office.

5.88 Electronic copies of the second supplement (unsigned) were emailed to the City Attorney and City Manager the same day.

5.89 This second supplement informed Nuttall and Cubic that the City had still not contacted Plaintiff in any format regarding the ADA accommodation request or status inquiry.

## VI. STATEMENT OF CLAIMS

Page 16 – Complaint

6.1    CLAIM ONE: Violation of 28.C.F.R § 35.107(a) and (b) (Against the City of Grants Pass)

    A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 4.2-4.4 and 5.47-5.52 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

    B. As a public entity with more than fifty employees, the City of Grants Pass is required by 28 C.F.R. § 35.107 to designate at least one responsible employee to coordinate ADA compliance and to publish grievance procedures providing for prompt and equitable resolution of complaints.

    C. The City failed to provide Plaintiff with the identity of a designated ADA coordinator or a published, accessible grievance procedure, despite Plaintiff's repeated requests for assistance.

    D. Defendants Nuttall and Cubic, acting as agents of the City, failed to fulfill the duties of a designated coordinator, failed to redirect Plaintiff to such a person, and failed to provide any information regarding a published grievance procedure.

    E. This institutional failure effectively denied Plaintiff the means to seek a reasonable accommodation, left Plaintiff in a state of administrative limbo, and contributed to the severe clinical fracture of Plaintiff's medical baseline.

6.2    CLAIM TWO: Violation of Title II of the ADA, Failure to Accommodate (Against the City of Grants Pass)

    A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to Exhibit C and paragraphs 1.23, 1.24, 4.2-4.4 and 5.47-5.52 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

    B. On February 1, 2026, Plaintiff provided the City, through Nuttall and Cubic, with notice of her disabilities and requested reasonable accommodations to mitigate

clinical destabilization. On March 4, 2026, Plaintiff submitted a status update request regarding the initial accommodation request.

C. The City failed to initiate the fact-specific interactive process regarding Plaintiff's accommodation request. Rather than engaging in the process, Defendants Nuttall and Cubic provided no response to Plaintiff's inquiries or requests for accommodation.

D. The leadership's decision to maintain silence occurred despite clear, pre-existing awareness of systemic deficiencies in the City's accommodation procedures, specifically:

1. The City's failure to meaningfully engage with Disability Rights Oregon (DRO) regarding accommodation requests between September 2024 and January 2025.

2. Documentation in a January 30, 2025, circuit court complaint identifying the City's lack of an institutional process for accommodation requests.

3. An August 6, 2025, admission by the City Attorney to the City Manager and City Council that the City lacked a reasonable ADA accommodation process.

E. Despite explicit, documented notice to the City Council and City Manager regarding the absence of a functional accommodation process, executive leadership did not implement a compliant procedure and chose not to initiate the interactive process or otherwise engage with Plaintiff.

F. During February, March, and April, 2026, the City persisted in inconsistent and noncompliant public records request practices, directly exacerbating the instability Plaintiff sought to avoid.

G. The City's failure to engage in the interactive process constitutes deliberate indifference and a reckless disregard for Plaintiff's health. By choosing silence over a good-faith response to documented medical needs, the City foreseeably

Page 18 – Complaint

caused the severe emotional distress, severe clinical fracture of Plaintiff's medical baseline, and physical manifestations of stress.

6.3   CLAIM THREE: ADA Title II Retaliation (Against the City of Grants Pass)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to Exhibit C and paragraphs 1.23, 1.24, 4.2-4.4, 5.47-5.57, and 5.69-5.76 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. On February 1, 2026, Plaintiff provided the City, through the City Attorney and City Manager, with notice of her disabilities and requested reasonable ADA accommodations to mitigate PTSD and depression. On March 4, 2026, Plaintiff submitted a status update request regarding the initial accommodation request.

C. The City Manager and City Attorney possessed actual knowledge of these communications. Immediately following Plaintiff's formal February 1, 2026, accommodation request, the City's administrative processing of Plaintiff's public records requests underwent a distinct and measurable degradation.

D. This sudden shift resulted in a documented spike in statutory noncompliance, with the City's failure to provide mandatory five-day acknowledgments rising to 85% and its failure to provide the fifteen-business-day status update increasing to 50%. This sharp escalation in administrative friction and statutory noncompliance constitutes a materially adverse action objectively sufficient to dissuade a reasonable person from further exercising or standing upon their protected civil rights under the Americans with Disabilities Act.

E. The tight temporal proximity between Plaintiff's formal ADA accommodations request and this measurable baseline shift in public records compliance establishes a direct causal connection, demonstrating that the heightened administrative noncompliance was an adverse, retaliatory response to Plaintiff's protected activity.

Page 19 – Complaint

F.  As a direct and proximate result of the City's conduct, Plaintiff suffered a severe clinical fracture of her medical baseline, resulting in severe emotional distress, physical manifestations of stress, and the necessity for new, daily medical intervention.

6.4  CLAIM FOUR: First Amendment Retaliation Under 42 U.S.C. § 1983 (Against Stephanie Nuttall in her individual capacity)

A.  Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to Exhibit C and paragraphs 1.20-1.24, 4.3, and 5.44-5.56 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B.  Nuttall, acting under color of law, was aware of Plaintiff's protected activity, including correspondence sent on January 16 and January 20, 2026, which involved the exercise of her rights to free speech and to petition the government under the First Amendment.

C.  Following these protected communications, Plaintiff submitted a formal request for ADA accommodations on February 1, 2026. Nuttall responded by maintaining total silence and failing to initiate the fact-specific interactive process, actively withholding any administrative response to Plaintiff's request.

D.  In the alternative, if the silence was triggered solely by the January 20, 2026, Notice of Tort Claim, it constitutes a direct retaliatory response to Plaintiff's formal exercise of her right to seek redress for grievances.

E.  Upon information and belief, the immediate wall of silence from Nuttall regarding the February 1, 2026, ADA request, coming right on the heels of Plaintiff's January 16 and January 20, 2026, protected communications, was no coincidence, but a direct retaliatory reaction motivated by Plaintiff's protected activity.

F.  Nuttall's individual actions would chill or silence a person of ordinary firmness from continuing to exercise their First Amendment rights, and directly and

proximately resulted in severe emotional distress, a severe clinical fracture of Plaintiff's medical baseline, and physical manifestations of stress.

6.5    CLAIM FIVE: Fourteenth Amendment Violation - Equal Protection / Class of One Under 42 U.S.C. § 1983 (Against Stephanie Nuttall in her individual capacity) - Pleading the Alternative

    A.  Plaintiff incorporates paragraphs 6.4(A) through 6.4(F) by reference as if fully set forth within.

    B.  Nuttall, acting under color of law, intentionally treated Plaintiff differently from other individuals who are similarly situated in the relevant respect of submitting administrative requests, inquiries, or communications to the City.

    C.  While the City routinely processes and responds to public inquiries, Nuttall applied a distinct, restrictive practice to Plaintiff by systematically withholding any response to her formal February 1, 2026, request for ADA accommodation and her subsequent administrative status inquiry.

    D.  On August 6, 2025, Nuttall explicitly confirmed that she was fully aware of the City's universal administrative obligations, stating publicly at a city council meeting that the City must develop a reasonable ADA accommodation process which is required by law and that the City needs to have ADA accommodations. Despite this explicit acknowledgment of the legal baseline required for all individuals, Nuttall chose to completely withhold that mandatory process from Plaintiff.

    E.  There is no rational basis for this steep disparity in treatment between Plaintiff and all other similarly situated members of the public seeking standard administrative interaction with the City, particularly given Nuttall's public admission of the City's mandatory legal duties.

    F.  In the alternative, if Nuttall's conduct was not retaliatory, it constituted an arbitrary and capricious denial of access, distinguishing Plaintiff's treatment from the standard administrative process without any legitimate governmental

justification.

G. As a direct and proximate result of this disparate treatment, Plaintiff suffered severe emotional distress, a severe clinical fracture of her medical baseline, and physical manifestations of stress.

6.6 CLAIM SIX: First Amendment Retaliation Under 42 U.S.C. § 1983 (Against Aaron Cubic in his individual capacity)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to Exhibit C and paragraphs 1.20-1.24, 4.4, 5.44-5.57, and 5.67 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. Cubic, acting under color of law, was aware of Plaintiff's protected activity upon receipt of her complaint letter and Notice of Tort Claim on January 20, 2026, both of which constituted a formal petition to the government for a redress of grievances protected under the First Amendment.

C. Following receipt of this protected activity, Cubic established a pattern of total nonengagement. He ignored Plaintiff's subsequent February 1, 2026, ADA accommodation request, her March 4, 2026, status update request, and her Notice of Tort Claim Supplement that documented her medical relapse, failing to perform any supervisory oversight or facilitate the interactive process.

D. Cubic's sustained refusal to acknowledge or address these communications meant that even basic administrative routing or confirmation was denied. By choosing to remain silent, he chose not to exercise his supervisory authority to ensure the interactive process was initiated by his administration. This targeted nonresponsiveness is objectively sufficient to chill a person of ordinary firmness from continuing to exercise their First Amendment rights.

E. The temporal proximity between Plaintiff's protected activity and Cubic's pattern of silence demonstrates a direct causal connection, establishing his conduct as

retaliation for Plaintiff's exercise of her First Amendment rights.

F. As a direct and proximate result of Cubic's retaliatory conduct, Plaintiff suffered severe emotional distress, a severe clinical fracture of her medical baseline, and physical manifestations of stress.

6.7 CLAIM SEVEN: Fourteenth Amendment Violation - Equal Protection / Class of One Under 42 U.S.C. § 1983 (Against Aaron Cubic in his individual capacity) - Pleading the Alternative

A. Plaintiff incorporates paragraphs 6.6(A) through 6.6(F) by reference as if fully set forth within.

B. Cubic, acting under color of law, intentionally treated Plaintiff differently from other individuals who are similarly situated in the relevant respect of submitting administrative requests, inquiries, or communications to the City Manager's office.

C. While the City Manager's office routinely processes and responds to public inquiries, Cubic applied a distinct, restrictive practice to Plaintiff by withholding any response or basic routing for her formal request for ADA accommodations and subsequent status update request.

D. There is no rational basis for the disparity in treatment between Plaintiff and other members of the public seeking administrative interaction with the City Manager, particularly given the City's established administrative obligations to process such requests.

E. In the alternative, if Cubic's conduct was not retaliatory, it constituted an arbitrary and capricious denial of access, distinguishing Plaintiff's treatment from standard administrative practices without any legitimate governmental justification or executive necessity.

F. As a direct and proximate result of this disparate treatment, Plaintiff suffered severe emotional distress, a severe clinical fracture of her medical baseline, and physical manifestations of stress.

6.8    CLAIM EIGHT: Violation of Oregon Constitution, Article I, Sections 8 and 26, Freedom of Speech and Petition for Redress (Against Stephanie Nuttall and Aaron Cubic, with the City of Grants Pass as the Real Party in Interest)

    A. Plaintiff incorporates paragraphs 6.4(A)-6.4(F) and 6.6(A)-6.6(F) by reference as if fully set forth within.

    B. Article I, Section 8 and Section 26 of the Oregon Constitution prohibit state actors and public officials from imposing punitive measures, burdens, or retaliatory consequences upon individuals for exercising their right to speak and write freely, express public concerns, or petition the government for redress of grievances.

    C. Nuttall penalized Plaintiff's speech by maintaining a continuous wall of silence. She chose to leave Plaintiff's emails entirely unanswered, ensuring that basic professional communication was denied from the start.

    D. Cubic's office similarly penalized Plaintiff's speech through complete nonengagement. Following the protected correspondence, no acknowledgment, routing notification, or response of any kind was issued from his office regarding Plaintiff's emails.

    E. Such punitive measures represent an impermissible burden on Plaintiff's speech and petitioning rights. The complete nonresponsiveness from both the City Attorney and City Manager effectively penalized her expression, causing the severe harms described herein.

6.9    CLAIM NINE: Intentional Infliction of Emotional Distress (Against Stephanie Nuttall and Aaron Cubic, with the City of Grants Pass as the Real Party in Interest)

    A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to Exhibit C and paragraphs 1.20-1.24, 4.3-4.4, 5.44-5.57, and 5.84-5.86 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

    B. Nuttall and Cubic, in their official roles as city attorney and city manager,

received written notice on January 20, 2026, detailing Plaintiff's medical vulnerabilities, including pre-existing PTSD, a recent medication increase, and periods of derealization. On February 1, 2026, Defendants received notice of an additional vulnerability and a formal request for reasonable accommodations under the ADA.

C. Following receipt of these notices, Nuttall and Cubic did not respond to the ADA request, implementing a sustained silence that was most critical from February 1, 2026, through March 31, 2026, in respect to Plaintiff's health.

D. On March 4, 2026, Nuttall and Cubic received an email requesting a status update on the ADA request.

E. On March 16, 2026, while the lack of communication was ongoing, Nuttall and Cubic received a formal Tort Claim Supplement notifying them that their silence to Plaintiff's ADA request had contributed to a clinical relapse of Major Depressive Disorder and the necessity of an additional daily psychiatric medication.

F. Maintaining a total lack of communication with a disabled citizen, after receiving notice of her vulnerabilities in January, her formal ADA request in February, and her active deterioration in March, constitutes conduct that exceeds the bounds of socially tolerable behavior under the circumstances.

G. Defendants acted either with the intent to cause severe distress or with reckless disregard of a substantial and unjustifiable risk that their continuous silence was highly certain to cause severe emotional distress and clinical destabilization.

H. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress and clinical destabilization, including a documented relapse of Major Depressive Disorder that manifested physically in periods of unwanted extended fasting and disruption to basic daily care. This distress necessitated immediate clinical intervention, including the prescription of an additional daily psychiatric medication to manage the severe, escalating symptoms. Consequently,

Plaintiff has faced an ongoing, months-long struggle to regain medical stability.

6.10  CLAIM TEN: First Amendment Retaliation Under 42 U.S.C. § 1983 (Against the City of Grants Pass)

A.  Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to Exhibit C and paragraphs 1.20-1.24, 4.2-4.4, and 5.44-5.57 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B.  Following Plaintiff's exercise of protected First Amendment rights on January 20 and February 1, 2026, the City of Grants Pass, acting through its City Manager (acting under color of law) in his capacity as the final administrative policymaker, directly implemented and authorized a course of systemic nonresponsiveness.

C.  This municipal action was executed through a wall of silence from both the City Manager's office and the City Attorney's office, alongside an immediate, sharp escalation of public records statutory noncompliance. These actions functioned as a unified administrative posture in response to Plaintiff's protected activities, which materially burdened Plaintiff's administrative access.

D.  The sustained refusal to communicate by the City's executive offices, coupled with the systemic degradation of municipal records services, constitute adverse actions that would chill or silence a person of ordinary firmness from continuing to exercise their First Amendment rights.

E.  The close chronological proximity between Plaintiff's protected speech, the Notice of Tort Claim, the ADA request, and the immediate implementation of this systemic nonresponsiveness supports the inference that Plaintiff's protected activity was a substantial or motivating factor in the City's adverse actions.

F.  As a direct and proximate result of the City's official position, through its final policymaker, Plaintiff experienced ongoing interference with her public participation, faced persistent delays and increased burdens in accessing

Page 26 – Complaint

government services, and suffered severe emotional distress, a severe clinical fracture of her medical baseline, and physical manifestations of stress.

6.11  CLAIM ELEVEN: Fourteenth Amendment Violation - Equal Protection / Class of One Under 42 U.S.C. § 1983 (Against the City of Grants Pass) - Pleading the Alternative

A. Plaintiff incorporates paragraphs 6.10(A)-6.10(F) as if fully set forth herein.

B. The Equal Protection Clause of the Fourteenth Amendment prohibits a public entity from treating similarly situated individuals differently without a rational basis, and from discriminating against individuals on the basis of disability.

C. The City has violated these protections toward Plaintiff under alternative theories of liability by either:

1. Intentionally singling Plaintiff out for disparate, adverse treatment compared to other similarly situated members of the public without any rational basis; or

2. Failing to implement an ADA accommodation process, thereby depriving a disabled citizen of the administrative access and services routinely provided to others.

D. The City, acting through the City Manager (under color of law) in his official capacity as the final administrative policymaker, directly authorized and implemented actions that systematically hindered Plaintiff's access to administrative services and accommodation protocols, treating Plaintiff differently than general members of the public whose statutory requests and communications are routinely processed without executive nonresponsiveness.

E. There is no rational basis for the City to facilitate administrative compliance and public communications for members of the public while burdening that same access for Plaintiff, especially when such burdens disproportionately impact Plaintiff due to her disability.

F. If the City's conduct was not motivated by an intent to retaliate as alleged in Claim Ten, it nevertheless constituted an arbitrary, irrational, and discriminatory

interference with Plaintiff's access to municipal services without a legitimate governmental interest.

G. As a direct and proximate result of this disparate treatment, Plaintiff has experienced ongoing interference accessing municipal services and has suffered severe emotional distress, a severe clinical fracture of her medical baseline, and physical manifestations of stress.

6.12 CLAIM TWELVE: Libel Against Christy Lansdown (with the City of Grants Pass as the Real Party in Interest)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 4.7, 5.13-5.18, and 5.28 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. On October 14, 2025, while acting within the scope of employment for the city, Lansdown published a false statement in the GPPD's CAD notes, writing that Plaintiff did not go to the Sheriff's office, when Plaintiff had, in fact, complied with the GPPD's redirection to the JCSO on October 9, 2025.

C. Lansdown made this false entry without ever asking Plaintiff whether she had gone to the Sheriff's office. Within minutes of entering the false CAD note, Lansdown further published disparaging remarks about Plaintiff via MDT messages to Sgt Coney, specifically labeling Plaintiff as a "fun one" and "not being very cooperative" (quoted material capitalized in original).

D. The immediate chronological proximity of these MDT messages, combined with the failure to verify the facts, demonstrates Lansdown's state of mind, proving that the false CAD entry was not an innocent clerical error or a simple typographical error but was made with a reckless disregard for the truth.

E. These statements were published to third parties, including Sgt Coney, and were false, unprivileged, and harmful to Plaintiff's reputation within the law

enforcement department. Upon reviewing the public records on February 1, 2026, the discovery of these false and disparaging communications caused Plaintiff severe emotional distress and physical manifestations of stress.

6.13 CLAIM THIRTEEN: Slander Against Christy Lansdown (with the City of Grants Pass as the Real Party in Interest)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 1.9-1.12, 4.7, 5.16, 5.17, 5.28, and 5.29 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. On November 4, 2025, while acting within the scope of employment for the City, Lansdown verbally communicated false and disparaging statements regarding Plaintiff over the telephone, stating that Plaintiff was "uncooperative" and "refused to go to the sheriff's office."

C. These spoken statements directly mirrored the false written entries and dismissive remarks Lansdown generated on October 14, 2025, reinforcing an inaccurate narrative within the department..

D. These statements were spoken over an administrative telephone line, publishing the false narrative to third parties, including the recipient of the call. These statements were actively captured by the department's recording systems and spoken in close proximity to the department's communal and public workspace behind the glass window, where they were audible to or subsequently reviewed by other department personnel and supervisors.

E. These spoken statements were false and not privileged.

F. As a direct and proximate result of these unprivileged, false spoken statements, Plaintiff suffered severe emotional distress, a critical destabilization of her medical baseline, and incurred specific economic damages, including the financial cost of a three-night trip to Corvallis.

Page 29 – Complaint

6.14 CLAIM FOURTEEN: First Amendment Retaliation Under 42 U.S.C § 1983 (Against Christy Lansdown in her individual capacity)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 1.9-1.12, 4.7, 5.13-5.18, 5.28, and 5.29 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. At all times relevant to this action, Lansdown acted under color of law in her capacity as a records clerk for the department.

C. On October 14, 2025, Plaintiff engaged in protected activity under the First Amendment by requesting a supervisor to report that she had been incorrectly redirected to the Sheriff's office and to ensure an official police report was documented.

D. During and after Plaintiff's interaction with Lansdown, the following events occurred:

    1. Lansdown disseminated derogatory and false statements regarding Plaintiff directly to Sgt Coney;

    2. Lansdown provided the false narrative that preceded Sgt Coney approving the police report under a repealed statute;

    3. On November 4, 2025, during a recorded phone call, Lansdown reinforced her characterization of Plaintiff as uncooperative and falsely alleged Plaintiff refused to go to the sheriff's office in response to Plaintiff's inquiry regarding why the GPPD sent the police report to RADE if it was supposed to go to JMET;

E. The actions and events, in temporal proximity to Plaintiff's protected activity, demonstrate that Lansdown's conduct has burdened Plaintiff's ability to exercise her constitutional and statutory rights.

F. As a direct and proximate result of Lansdown's conduct, Plaintiff suffered the

dissemination of false statements, a critical destabilization of her medical baseline requiring acute pharmaceutical management, a total loss of trust in local law enforcement resulting in immediate safety displacement to Corvallis, an acute derealization episode, and severe emotional distress.

6.15 CLAIM FIFTEEN: Violation of Oregon Constitution, Article I, Sections 8 and 26 (Against Christy Lansdown, with the City of Grants Pass as the Real Party in Interest)

    A. Plaintiff incorporates paragraphs 6.14(A) through 6.14(F) as if fully set forth herein.

    B. While acting within the scope of employment for the city, Lansdown engaged in a course of conduct that functioned to penalize Plaintiff's exercise of protected speech and the right to petition the government for redress of grievances.

    C. This conduct constitutes a direct violation of Article I, Section 8 of the Oregon Constitution, which protects the right of individuals to speak and write freely on any subject, and Article I, Section 26, which guarantees the right to assemble and petition the government for a redress of grievances.

    D. Lansdown's dissemination of false statements and her inaccurate characterization of Plaintiff served to undermine Plaintiff's reputation and standing within the department, compromising the neutrality of Plaintiff's subsequent interactions with department personnel.

6.16 CLAIM SIXTEEN: First Amendment Retaliation Under 42 U.S.C § 1983 (Against Brian Coney in his individual capacity)

    A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 4.6 and 5.16-5.24 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

    B. Upon information and belief, immediately after Plaintiff exercised her First Amendment right to request a supervisor and report a crime on October 14, 2025,

Page 31 – Complaint

Sgt Coney, under color of law, reviewed the GPPD CAD notes, which included Lansdown's false entry stating that Plaintiff failed to report to the Sheriff's office.

C. In the course of this same administrative interaction, Sgt Coney received disparaging remarks from Lansdown on the MDT system, labeling Plaintiff as "a fun one" and "not being very cooperative" (quotes capitalized in original).

D. Sgt Coney subsequently approved Plaintiff's police report on October 23, 2025, which cited a statute repealed in 2017.

E. The application of this dead statute represents a severe departure from standard law enforcement protocols, as Sgt Coney possesses over twenty years of law enforcement experience in Southern Oregon, and departmental responses confirm that the GPPD utilizes current, up-to-date Oregon Revised Statutes.

F. By formally validating a deficient report with an invalid, archaic legal basis while in possession of the false CAD entry and dismissive MDT messages, Sgt Coney used his supervisory authority to codify a false narrative, finalizing an official record that penalized and conflicted with Plaintiff's protected petitioning activity.

G. Sgt Coney's individual conduct, in close temporal proximity to the protected activity, constitutes an adverse administrative action that would chill a person of ordinary firmness from continuing to petition the government for redress.

H. As a direct and proximate result of Sgt Coney's conduct, Plaintiff suffered a deprivation of her constitutional rights and the formal entry of a legally deficient and invalid official law enforcement record.

6.17 CLAIM SEVENTEEN: Fourteenth Amendment Violation—Equal Protection / Class-of-One Under 42 U.S.C. § 1983 (Against Brian Coney in his Individual Capacity) - Pleading the Alternative

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 4.6 and 5.16-5.24 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other

paragraphs.

B. On October 14, 2025, Plaintiff engaged in protected activity by stating she had been incorrectly redirected by GPPD personnel to the sheriff's office and requesting that the department generate an official incident report for offenses occurring within city limits.

C. Coney, acting under color of law as a police sergeant, was personally responsible for reviewing, verifying, and final-approving the resulting police report.

D. That finalized police report regarding Plaintiff's complaint cited ORS 475.856, a criminal statute that had been repealed by the Oregon Legislature in 2017.

E. Plaintiff was similarly situated to all other members of the public who report incidents to the Grants Pass Police Department, all of whom are entitled to official police records that are maintained with accuracy and grounded in valid, current legal frameworks, which precludes the finalization of official records utilizing invalid, repealed, or inaccurate state statutes.

F. Plaintiff's report was the only police report processed by the Grants Pass Police Department to cite ORS 475.856 since at least January 1, 2020, resulting in disparate administrative treatment.

G. Coney's approval of a legally dead, 2017-repealed statute on an official municipal record represents a severe departure from the baseline standards of administrative accuracy expected of a supervisor, particularly given his more than twenty years of law enforcement experience in Southern Oregon, and lacks any legitimate, rational government interest.

H. There is no legitimate, rational government interest served by a law enforcement supervisor knowingly or recklessly validating an obsolete, legally nonexistent statute on an official municipal record.

I. In the alternative, if Coney's conduct was not retaliatory, it constituted an arbitrary and capricious failure of administrative review, distinguishing Plaintiff's treatment from that of all other reporting citizens without any legitimate

Page 33 – Complaint

governmental justification or operational necessity.

J. As a direct and proximate result of this arbitrary and discriminatory treatment, Plaintiff was denied the standard of administrative care afforded to other citizens, resulting in the official finalization of a legally deficient and invalid record, thereby solidifying her complete lack of institutional trust and confirming that the department could not be relied upon to handle basic legal protocols or generate accurate official records.

6.18  CLAIM EIGHTEEN: Violation of Oregon Constitution, Article I, Sections 8, 10, and 20 (Pursuant to ORS 30.265) (Against Brian Coney, with the City of Grants Pass as the Real Party in Interest)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 4.6 and 5.16-5.24 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. As a law enforcement supervisor acting within the scope of employment for the city, Coney was responsible for verifying, correcting, and authorizing official municipal records and had a duty to perform his oversight role in compliance with the requirements and protections of the Oregon Constitution.

C. Coney failed to meet this standard of care on October 23, 2025, by validating a police report containing ORS 475.856, a criminal statute that had been repealed by the Oregon Legislature in 2017.

D. Coney approved this invalid statute after reviewing Lansdown's false statement in the GPPD CAD notes and receiving MDT transmissions from Lansdown that labeled Plaintiff as "a fun one" and "not being very cooperative," thereby formalizing an inaccurate record rather than ensuring its statutory accuracy.

E. This failure of supervisory oversight constituted a concurrent breach of three distinct standards of care anchored to the Oregon Constitution:

Page 34 – Complaint

1. Article I, Section 8: By approving a deficient report following Plaintiff's protected expression stating she was incorrectly redirected to the sheriff's office, Coney's final approval functioned to penalize Plaintiff's speech by rendering the requested record legally invalid.

2. Article I, Section 20: By approving a report utilizing a 2017-repealed statute, Coney denied Plaintiff the standard administrative privilege automatically afforded to all other citizens, which is the right to an incident record processed under valid, current state law. This distinct departure from standard practice created an arbitrary classification of one.

3. Article I, Section 10: By anchoring the official record to a nonexistent criminal statute, Coney rendered the administrative record inaccurate, preventing the police report from being properly processed or audited through due course of law.

F. As a direct and proximate result of this breach of duty under state law, Plaintiff was denied the standard of administrative care afforded to other citizens, resulting in the finalization of an invalid municipal record, a total loss of institutional trust, and forcing Plaintiff to expend her own time and resources to conduct a mini-audit of GPPD public records to determine if other citizens were subjected to similar treatment.

6.19 CLAIM NINETEEN: First and Fourteenth Amendment Supervisor Liability Under 42 U.S.C. § 1983 (Against Warren Hensman in his Individual Capacity)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 4.5, 5.5-5.12, 5.16-5.24, 5.28-5.43, 5.63-5.65, and 5.68-5.77 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. Plaintiff engaged in ongoing, lawful efforts to utilize state and municipal

administrative processes by reporting suspected offenses, requesting GPPD supervisory intervention, filing public records requests with the GPPD, and submitting a compliance determination from the Public Records Advocate.

C. Warren Hensman, acting under color of law and as Chief of Police, has supervisory authority over all sworn officers and non-sworn records personnel within the GPPD, including Defendants Coney and Lansdown.

D. Chief Hensman had explicit, personal notice of operational failures within his department from two distinct sources:

   1. A labor arbitration investigation and decision, issued by an Oregon Employment Relations Board (ERB) appointed arbitrator, put Chief Hensman on notice that an internal department investigation and resulting final report were seriously flawed, lacked basic due process, and misapplied an irrelevant criminal statute on official department paperwork.

   2. On January 14, 2026, Plaintiff notified Chief Hensman via email that his Records Unit was failing to comply with the mandatory statutory requirements of ORS 192.324(2) and provided an official interpretation from the Public Records Advocate as proof.

E. Despite having this actual, personal knowledge, and following his public assertion at the January 7, 2026, city council meeting that his department treats everyone with dignity and respect and possesses a track record of excellence, Chief Hensman acted with deliberate indifference by failing to intervene, supervise, or correct his subordinates. Specifically, Chief Hensman:

   1. Failed to adequately supervise his reviewing sergeants, including Sgt Coney, resulting in the approval of a legally invalid police report that cited a statute repealed in 2017 (ORS 475.856), leaving an uncorrected error in the official record that prevented the report from being properly processed, tracked, or audited.

Page 36 – Complaint

2. Failed to ensure reviewing sergeants, in particular, were provided reference materials to verify officer-narrative accuracy. (Records personnel stated the sergeants do not have these types of materials.)

3. Failed to supervise or correct the practices of his records personnel, causing the Records Unit's noncompliance rate to sharply escalate after February 1, 2026.

F. This lack of supervisory oversight over both the records personnel and the reviewing officers, including Sgt Coney, allowed processing errors and statutory noncompliance to persist uncorrected within the department's official systems.

G. A police chief's refusal to oversee or correct an ongoing, documented pattern of structural statutory noncompliance and inaccurate reporting by his subordinates would deter a person of ordinary firmness from seeking administrative redress, holding local government accountable, or engaging in standard crime reporting, constituting a violation of the First Amendment.

H. A police chief's deliberate indifference to these systemic reporting and administrative failures infringes upon an individual's protected Fourteenth Amendment liberty interests in personal safety and psychological integrity when those uncorrected failures directly jeopardize the individual's well-being and security.

I. As a direct and proximate result of Chief Hensman's personal involvement through deliberate indifference and failure to supervise his staff, Plaintiff suffered a severe clinical fracture of her medical baseline in early 2026, resulting in severe emotional distress, physical manifestations of stress, and deterrence from engaging with the department for standard crime reporting.

6.20 CLAIM TWENTY: Violation of Fourteenth Amendment Under 42 U.S.C. § 1983 (Against the City of Grants Pass)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically

Page 37 – Complaint

directs attention to paragraphs 4.2-4.4 and 5.13-5.43 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. At all times relevant, each and every city official, administrator, supervisor, and employee identified in this claim acted under color of state law and within the course and scope of their official municipal capacities.

C. The finalized report in Plaintiff's matter cited ORS 475.856, a criminal statute repealed by the Oregon Legislature in 2017. A city employee subsequently did not deny that the application of this obsolete statute was a deliberate choice.

D. Procedural Due Process Deprivation: By finalizing an official record built on a defunct statute, and subsequently taking no corrective action after Plaintiff notified the City Attorney, City Manager, and GPPD Records Supervisor via email, the City deprived Plaintiff of a meaningful administrative mechanism to have the error audited or corrected. This deprivation is established by the continuous absence of any supplemental report entries or administrative corrections since November 4, 2025, leaving the legally invalid record uncorrected in the City's active records system.

E. Equal Protection / Class of One Deprivation: the City subjected Plaintiff to unique, disparate treatment lacking any legitimate governmental interest or rational basis. The application of this legally invalid code was unique to Plaintiff's matter, as no other GPPD incident report filed, starting January 1, 2020, utilized this repealed statute.

F. These deprivations were directly caused by the City's failure to maintain or utilize adequate quality controls in its report-review process. The City officially stated through Satterfield on February 25, 2026, that it has "no records responsive" to requests for supervisor reference materials, standard operating procedures, or quality control manuals used to verify the accuracy of officer narratives. Satterfield further declared that reviewing supervisors "do not attend or receive

Page 38 – Complaint

special training in reference to reviewing and finalizing officer narratives."

G. The City had explicit notice via a recent labor arbitration decision that its lack of administrative controls resulted in a structurally flawed report that misapplied an irrelevant criminal statute. Despite this notice, the City chose not to implement training protocols or formal review tools for reviewing officers, including sergeants, which allowed a defunct statute to be finalized as an official municipal record in Plaintiff's case.

H. Armed with this specific knowledge that its review process was structurally flawed, the City acted with deliberate indifference to the obvious risks of its unmonitored record-keeping system. The City nevertheless chose not to implement revised report-review procedures, affirmatively chose to leave reviewing sergeants untrained and without the reference tools necessary to verify statutory accuracy, and allowed the custom of rubber-stamping legally deficient paperwork to continue.

I. As a direct and proximate result of the City's custom and deliberate indifference, Plaintiff's report was finalized using a repealed statute and left uncorrected in the department's official records, depriving Plaintiff of a legally compliant record, cementing a total loss of institutional trust, and leaving her deterred and unwilling to engage with the GPPD for future incident reporting.

6.21 CLAIM TWENTY-ONE: Violation of the Fourteenth Amendment Due Process Clause Under 42 U.S.C. § 1983, Arbitrary Action and Failure to Correct Defective Records (Against the City of Grants Pass)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 4.4 and 5.35-5.36 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. At all times relevant, the City of Grants Pass City Manager, acting under color of

law, possessed final administrative and executive policymaking authority regarding municipal operations, department oversight, and the official records maintained by the City.

C. On January 20, 2026, the City Manager received formal legal notice of this dispute via Plaintiff's Notice of Tort Claim and a complaint letter with timeline. Both documents notified the City of the specific police report case number and detailed that the official record contained a criminal statute (ORS 475.856) that had been repealed in 2017.

D. On February 4, 2026, a GPPD records clerk asserted to Plaintiff that the department utilizes the most up-to-date version of the Oregon Revised Statutes. Plaintiff notified the clerk via email that citing a 2017-repealed statute on a 2025 police report contradicted that assertion, putting the department on notice that the record's defect constituted a deliberate administrative choice to use an invalid citation.

E. Anticipating that the record remained uncorrected despite these prior legal and departmental notices, Plaintiff contacted the GPPD Records Unit in March. Upon confirming the ongoing use of the repealed statute, Plaintiff sent a written email directly to the City Manager on March 8, 2026, formally requesting that the City replace the defunct citation with the correct, active statutory code by March 13, 2026.

F. Following delivery of this formal notice, the City Manager took no administrative action to correct the known statutory defect. On March 14, 2026, the GPPD Records Unit confirmed that the 2017-repealed statute remained the official citation on the finalized record. By declining to have the record corrected despite formal Tort Claim notice, departmental confrontation, and a final demand, the City Manager established the decision as the City's official position.

G. The City's affirmative choice to maintain a repealed statute on a finalized record constitutes arbitrary government action lacking any rational relationship to a

Page 40 – Complaint

legitimate governmental interest. Following Plaintiff's explicit requests, the City retained the invalid record and provided no administrative path for its correction, rendering the report defective and legally inaccurate.

H. As a direct and proximate result of the City Manager's deliberate decision to leave the record uncorrected, Plaintiff was denied the standard of administrative care afforded to other citizens, resulting in the ongoing maintenance of a legally defective official public record. The City's refusal to correct the legally invalid citation left Plaintiff with no remaining administrative recourse, forcing Plaintiff to seek formal judicial intervention as the sole available means to remedy the inaccurate record and protect Plaintiff's rights from arbitrary administrative action.

6.22 CLAIM TWENTY-TWO: Violation of the Oregon Constitution, Article I, Sections 10 and 20, Arbitrary Administrative Inaction and Obstruction of Justice (Against the City of Grants Pass)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 5.35-5.36 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. Article I, Section 20 of the Oregon Constitution protects individuals from arbitrary, standardless administrative action and ensures equal distribution of administrative care. Article I, Section 10 mandates that justice shall be administered completely and without delay, guaranteeing that every person shall have a remedy by due course of law and unobstructed access to the legal mechanisms necessary to seek redress.

C. On March 8, 2026, Plaintiff provided written notice to the City Manager, identifying the official police report that contained a 2017-repealed statute (ORS 475.856), rendering the record legally deficient. Despite having the administrative authority to correct the record, the City Manager took no action. On March 14,

Page 41 – Complaint

2026, the GPPD Records Unit confirmed that the defunct statute remained the official citation on the finalized record.

D. By maintaining a legally dead statute on an official record after receiving notice of the defect, the City engaged in arbitrary administrative inaction that directly caused a dual constitutional deprivation:

1. Article I, Section 20: The failure to maintain an accurate, legally viable record denied Plaintiff the standard administrative care and statutory consistency afforded to all other citizens who file reports with the GPPD, creating an unequal barrier to the standard administrative utility of her report.

2. Article I, Section 10: The ongoing preservation of a legally nonexistent citation effectively blocked the standard administrative pathway required to have a criminal complaint processed, audited, or tracked, thereby obstructing the administration of justice and denying Plaintiff her right to a remedy by due course of law.

E. An actual, justiciable controversy exists between Plaintiff and the City of Grants Pass regarding the legality of maintaining a structurally invalid official record that thwarts standard legal utility. The City's ongoing refusal to correct the record constitutes a continuing violation of Article I, Sections 10 and 20.

6.23 CLAIM TWENTY-THREE: Fourteenth Amendment Violation – Arbitrary Administrative Deception and Denial of Municipal Access Under 42 U.S.C. § 1983 (Against the City of Grants Pass)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 5.1-5.12 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. The Fourteenth Amendment protects citizens from arbitrary, standardless, and unauthorized municipal actions that obstruct or deny access to standard

government infrastructure and public services.

C. The City, through its police department acting under color of law, maintains an unwritten, widespread, and deeply entrenched municipal custom, policy, or practice of diverting and misdirecting targeted citizens who attempt to report offenses occurring within city limits to outside agencies, thereby creating an arbitrary administrative barrier to basic municipal access.

D. On October 9, 2025, Plaintiff attempted to report offenses occurring strictly within the city limits of Grants Pass. GPPD personnel redirected Plaintiff to the Josephine County Sheriff's Office (JCSO) based on an inaccurate jurisdictional claim, preventing the entry of a standard incident report.

E. In furtherance of this custom, in May 2026, GPPD records staff explicitly instructed a reporting party via email to divert a report of illegal city-limit activity to an outside task force (JMET) rather than taking a standard report, demonstrating that this unauthorized redirection is a continuous, operational custom.

F. Public records responses from the GPPD confirm that the municipality possesses no formal or informal written policy, standard operational manual, or legal authority authorizing personnel to redirect citizens reporting crimes within city limits to outside agencies.

G. The Josephine County Sheriff confirmed in writing that no operational agreement, memorandum of understanding, or concurrent jurisdiction policy exists allowing the GPPD to divert city-limit complaints to the Sheriff's Office without the GPPD first generating an internal police report.

H. The City's unwritten custom of utilizing standardless redirections constitutes arbitrary government action that lacks any rational relationship to a legitimate governmental interest and functions to systematically deny equal access to public reporting services.

6.24  CLAIM TWENTY-FOUR: ORS 192.324(2) Violations (Against the City of Grants Pass)

Page 43 – Complaint

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 5.58-5.77 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. ORS 192.324(2) mandates that a public body must acknowledge receipt of a public records request within five business days, and if the request is not fulfilled within that time, the acknowledgment must confirm the agency is the custodian and state that the request is being processed. The GPPD's initial email communications failed to meet these mandatory statutory requirements.

C. Across multiple public records requests that remained unfulfilled past the five-business-day deadline, Plaintiff received only one communication from the GPPD Records Unit regarding custodianship, which was noncompliant and delayed until the fifteenth business day.

D. The City's failure to adhere to the strict timelines of ORS 192.324 occurred despite the City being on formal notice starting January 14, 2026. The City received explicit, additional notice on February 1, 2026, via Plaintiff's formal ADA accommodation request specifically requesting compliance with ORS 192.324(2), demonstrating a reckless disregard for mandatory statutory procedures and directly compounding the harm to Plaintiff.

6.25  CLAIM TWENTY-FIVE: ORS 192.329(5) Violations (Against the City of Grants Pass)

A. Plaintiff incorporates paragraphs 1.1 through 5.89 by reference as if fully set forth herein. For the Court's convenience and to facilitate clarity, Plaintiff specifically directs attention to paragraphs 1.20-1.25 and 5.58-5.77 as establishing the factual basis of this claim, without waiving or limiting the full incorporation of all other paragraphs.

B. ORS 192.329(5) requires a public body to either complete its response to a public records request within fifteen business days or provide a written status update containing a specific, good-faith estimated date of completion.

C. The GPPD Records Unit's internal operating procedures recognize this mandate, stating that communication must be issued to a requester whenever the fifteen-day threshold is reached.

D. The GPPD Records Unit's public webpage states that its records procedures are governed by state regulations and followed in accordance with Oregon Revised Statutes, and that staffing is supplemented by on-call personnel when necessary to "assure quality service."

E. Plaintiff submitted ten distinct public records requests that extended past the fifteen-business-day statutory limit. Of those ten requests, Plaintiff received generic delay notices for only three, and not a single notice included the mandatory estimated date of completion.

F. Providing a vague notice of delay without an estimated date of completion fails to satisfy the plain language of ORS 192.329(5), effectively keeping the requester in an indefinite state of administrative limbo and constituting a constructive denial of the requested records.

G. The City allowed these systematic delays to persist after receiving Plaintiff's February 1, 2026, formal ADA accommodation request, which requested compliance with ORS 192.329(5), showing an institutional disregard for mandatory public records timelines and directly escalating the strain on Plaintiff's health.

## VII. JURY TRIAL DEMAND

7.1 Plaintiff demands a jury trial.

## VIII. PRAYER FOR RELIEF

8.1 Plaintiff respectfully requests that the Court order the following equitable relief or such other equitable relief as the Court deems necessary to ensure compliance with the ADA and Oregon law:

A. ADA Compliance and Training: the Court appoint a neutral third party to implement and monitor an ADA compliance program for the City of Grants Pass,

Page 45 – Complaint

including mandatory training for the City Manager and City Attorney to ensure the development and publication of a formal ADA reasonable accommodation process and grievance procedure.

B. Public Records Oversight: the Court mandate that a neutral third party conduct a comprehensive review of the GPPD Records Unit's procedures to ensure compliance with ORS 192, and oversee the implementation of training and policies to prevent further statutory violations.

C. Public Records Violations: for a judgment declaring that the City of Grants Pass violated the mandatory timelines of ORS 192.324(2) and ORS 192.329(5), and awarding statutory penalties in the amount of $200 per violation of ORS 192.329(5).

D. Police Supervision and Accuracy: the Court require that a neutral third party approve and oversee recurring training for GPPD supervisors regarding report accuracy, internal investigations, and the proper application of current state statutes, as well as verify that all digital and physical police-report writing tools and drop-down menus are up-to-date with current Oregon Revised Statutes.

E. Correction of Records: the Court order the City to remove all derogatory and false remarks regarding Plaintiff from all City-maintained records.

F. Constitutional Declaratory and Injunctive Relief: a judgment declaring that the City's refusal to correct the defunct statutory citation on Plaintiff's police report violates Article I, Sections 10 and 20 of the Oregon Constitution, and an injunction ordering the City to amend police report case number 25-36545 to reflect current, valid Oregon law.

8.2 Plaintiff requests the Defendants to cover all legal costs and disbursements associated with this action, pursuant to 42 U.S.C. § 1988.

8.3 Plaintiff seeks special damages in the form of a segregated fund for medical and therapeutic expenses in the amount of $35,000. These funds are specifically earmarked for expenses, such as therapy, acupuncture, and copays, necessitated by the City's bad-faith silence and

administrative obstruction, that are not covered by Plaintiff's insurance. This fund shall be managed by the City of Grants Pass and remain active for eighteen months, after which any remaining funds will revert back to the City of Grants Pass. This fund shall not be used as an offset against any other damages awarded.

8.4 Plaintiff requests damages from the City for the institutional deprivation of constitutional and statutory rights, arising from a failure to supervise its agents, its disregard for established ADA standards, and deliberate indifference. Jurisdictional guidance was arbitrary and used to deny Plaintiff basic government services, which led to the first medical relapse in October, 2025. The City of Grants Pass was initially put on notice about Plaintiff's pre-existing PTSD in January then put on further notice of Plaintiff's Major Depressive Disorder and need for ADA accommodations in February 2026. Despite this knowledge, the City's custom of bad-faith silence and refusing to engage in the interactive process effectively dismantled Plaintiff's fragile clinical stability, resulting in a second medical relapse in February/March 2026 and causing severe and documented physical and emotional suffering. These damages sought necessitate a judgment that reflects the gravity of the City's deliberate indifference and institutional neglect.

8.5 Plaintiff requests economic and non-economic damages against the City of Grants Pass for libel and slander in an amount to be determined at trial, but not to exceed the statutory liability limits of the Oregon Tort Claims Act.

8.6 Plaintiff requests economic and non-economic damages against the City of Grants Pass for intentional infliction of emotional distress in an amount to be determined at trial, but not to exceed the statutory liability limits of the Oregon Tort Claims Act.

8.7 Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, Stephanie Nuttall and Aaron Cubic, in their individual capacities, jointly and severally, for compensatory and punitive damages in an amount to be proven at trial, for the physical injury, severe emotional distress, and severe clinical fracture of Plaintiff's medical baseline caused by their willful and reckless disregard for Plaintiff's clearly established constitutional and statutory rights; such damages to include the pain, suffering, and loss of

stability necessitated by Defendants' deliberate indifference and bad-faith silence starting January 16, 2026 through the present.

8.8 Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Warren Hensman, in his individual capacity, for compensatory and punitive damages in an amount to be proven at trial, for the physical injury, clinical destabilization, and acute emotional distress caused by his deliberate indifference and failure to supervise; such damages to include the pain, suffering, and loss of stability necessitated by his failure to intervene to protect Plaintiff's clearly established constitutional and statutory rights following his receipt of actual notice of departmental noncompliance.

8.9 Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, Christy Lansdown and Brian Coney, in their individual capacities, jointly and severally, for compensatory and punitive damages in an amount to be proven at trial, for the physical injury, clinical destabilization, and severe emotional distress caused by their intertwined and reckless disregard for Plaintiff's clearly established constitutional and statutory rights; such damages to include the profound mental anguish, suffering, and loss of institutional trust resulting from Lansdown's dissemination of defamatory records and Coney's subsequent formalization of a legally defunct police report.

8.10 Plaintiff respectfully requests the City of Grants Pass to allocate funds to a designated 501(c)(3) organization dedicated to advancing and protecting individuals with disabilities in the State of Oregon. These funds shall not offset any damages received by Plaintiff or any funds that may already be designated for the 501(c)(3). The amount to be allocated shall be determined in good-faith cooperation by Plaintiff and the City.

8.11 Plaintiff respectfully requests such other and further relief as the Court deems just and equitable.

8.12 Plaintiff requests that this Court retain jurisdiction over this matter following the entry of a final judgment or approval of any settlement agreement, for a period necessary to ensure full implementation of, and complete compliance with, all ordered injunctive and equitable relief.

Page 48 – Complaint

Dated this 9th of July, 2026.

Jill Young
jillyodasilver@gmail.com
General Delivery
Grants Pass OR 97526
541-513-1153
Plaintiff Pro Se